449 So.2d 756 (1984)
William WILEY
v.
STATE of Mississippi.
No. 54642.
Supreme Court of Mississippi.
January 4, 1984.
Rehearing Denied May 16, 1984.
*757 James D. Franks, Hernando, for appellant.
Bill Allain, Atty. Gen. by Amy D. Whitten, Sp. Asst. Atty. Gen., Jackson, for appellee.
EN BANC.

PART I

GUILT PHASE
ROY NOBLE LEE, Justice, for the Court:
William Wiley was indicted and tried in the Circuit Court of DeSoto County, Honorable Andrew C. Baker, presiding, on a charge of capital murder. In a bifurcated trial, he was found guilty of capital murder and was sentenced by the jury to suffer the death penalty. He has appealed to this Court, assigning seven (7) errors in the trial below.
J.B. Turner operated a small convenience store in rural DeSoto County, Mississippi, usually keeping the store open from 7 a.m. until 12 p.m. Shortly after closing the store on August 21, 1981, Mr. Turner and his daughter were outside the store when they were both shot at close range with a .20-gauge shotgun. Mr. Turner was shot once in the chest and once in the back with small shotgun pellets and his daughter, Mrs. Patricia Harvey, was shot about the head and upper chest, but survived.
Mr. Turner had a money sack in which he carried $350 to $400. The money was taken by the assailant. Deputy Sheriff B.A. Herron arrived at the scene shortly after the shooting. Mr. Turner was lying near the building on his back, face up, and was dead. Mrs. Harvey was in a sitting position nearby, bleeding about the face and was blinded and seriously injured. Subsequently, an investigation at the scene disclosed three spent .20-gauge shotgun shells and one unfired, live round. A green army fatigue cap was discovered near the scene. Four days later, a .20-gauge pump shotgun was found by Max Wallace, a personal friend of the victim, in the weeds and bushes behind the convenience store. He did not remove the shotgun, but summoned officers from the sheriff's office who took possession of the gun.
Two and one-half weeks later, William Wiley was arrested in Memphis, Tennessee. He confessed to the robbery and murder. Wiley led officers to a place where he threw away the money bag after taking the money from it. He then took them to an old Pontiac automobile near his girlfriend's house and showed them where he kept the shotgun hidden prior to the robbery-murder.

I.
Were comments of the trial judge during the cross-examination of B.A. Herron prejudicial?
During the cross-examination of Deputy Sheriff B.A. Herron, the appellant's attorney interrogated him as to whether or not *758 it was normal procedure to tape the interrogation of someone suspected of committing a crime. Mr. Herron had recorded the interrogation of appellant. Five pages of the record were consumed in the cross-examination on that particular point and questions were asked him as to whether or not he remembered testifying a week previous in another case that he taped the interrogation of a defendant. His answers were "probably no" and that "he did not remember." Finally, the district attorney objected and the following colloquy ensued:
Q. That is not what I'm asking you. I'm asking you what you told the Jury, made up of people just like this, last week, under questioning by Mr. Kelly?
A. I don't remember.
Q. You don't remember?
A. No, sir.
Q. You don't remember back last week? You remember the questioning. Is that correct?
A. I remember he asked a similar question.
Q. Well, you just got through stating that you remembered the question. Do you remember the question or not?
A. Well, he asked about a tape recorder, but I don't remember what I answered.
Q. Do you remember him asking you if it was your normal procedure to tape record interrogation of a person who was suspected of a crime? Do you remember him asking you that?
A. Yes, sir.
Q. You remember the question. Is that correct?
A. Yes, sir. He asked me that question.
Q. But, you don't remember your own answer. Is that correct?
A. I don't normally do it.
Q. I'm not asking you that. I'm asking you whether you know your answer or not.
A. No, sir. I don't know exactly what I told him that morning.
Q. Do you know approximately what you told him that morning? Did you tell him "yes" or "no?"
A. I told him "no" probably.
Q. You told him "no probably" or you probably told him "no?"
A. Either way. I don't normally tape a  use a tape recorder.
Q. Are you trying to be evasive, Mr. Herron?
A. No, sir. I just don't normally use a tape recorder.
ASSISTANT DISTRICT ATTORNEY (Mr. Williams):
Your Honor, he's doing his dead level best to answer the question.
THE COURT: He's answered it, I think, five or six times, and I don't think it's going to be any different, Mr. Franks, and we'll move on to something that might be a little bit more beneficial to the Jury.
COUNSEL FOR DEFENDANT (Mr. Franks): I'm sorry, Your Honor, I'll move on but I wasn't aware that.
THE COURT: Well, if I thought that you could ever get him to change his mind, I'd let you go on all day, but I think, Mr. Herron has answered the question just the way he remembers it and I don't see any point in dwelling any longer.
COUNSEL FOR DEFENDANT (Mr. Franks): Well, was his answer "yes" or "no" or he didn't remember. I honestly do not know what his answer was.
THE COURT: Well, let him repeat it one more time.
A. I don't normally take a statement  take a tape recording.
COUNSEL FOR DEFENDANT (Mr. Franks): Your Honor, that's what I'm getting at. That's not the question I asked him.
THE COURT: Well, do you have anything to refresh the witness's memory with, Mr. Franks? I sat here in this box and conduct the trial and I swear before God I don't know what his answer was, nor whether he does or not, *759 I don't know. Have you got anything to impeach his testimony with, fine, but, just as far as verbal argument, I don't think you're going anywhere.
COUNSEL FOR DEFENDANT (Mr. Franks): Your Honor, all I want is to get a definitive answer. There's certainly plenty of impeachment proof.
THE COURT: Well, if you have something, let's go with it. If you've got something, you know, impeachment  this is cross examination  that's the purpose of it.
It is understood how the trial judge became worn and probably provoked at such a long cross-examination of the witness on a matter which, in our opinion, was immaterial and irrelevant. Appellant's counsel apparently was trying to impeach the witness on an immaterial matter, which is not permitted under our trial procedure. Carlisle v. State, 348 So.2d 765 (Miss. 1977); Sims v. State, 313 So.2d 388 (Miss. 1975).
We do not think the trial judge's remarks prejudiced the jury and they did not constitute reversible error. In addition, no record was made of any objection to the statement of the trial judge. Therefore, the point was not preserved and, consequently, was waived. Smith v. State, 434 So.2d 212 (Miss. 1983). It is the duty and responsibility of the trial judge to control and channel the interrogation and arguments of attorneys so as to insure an efficient and orderly trial. Carr v. State, 208 So.2d 886 (Miss. 1968).

II.
Did the lower court err in allowing into evidence, over appellant's objection, testimony and documentary evidence of the defendant's confession?
The trial court granted appellant a suppression hearing upon a challenge by him that the confessions were not admissible because appellant had requested an attorney during the Miranda warnings.[1] Appellant further claims a violation of his Miranda rights.
Appellant was advised of his Miranda rights on September 4, 1981, by Memphis Police Officer Williams; September 7, 1981, by Investigator Radford, at which time he filed a waiver of rights; twice on September 10, 1981, by Officer Stewart prior to giving the confession; and last on September 11, 1981, by Deputy Riley before leading officers to the money bag and automobile in which he had hidden the shotgun.
Appellant testified that, at the outset of the Miranda warning given him by Officer Stewart on September 10, he stated he wanted an attorney. However, all the officers present testified that appellant did not ask for an attorney and that, if he had so indicated, they immediately would have ceased questioning and would have provided him with the opportunity to obtain counsel. The cross-examination of appellant reflects positively and emphatically that he was aware of his constitutional rights and his right to an attorney and that he did not ask for or want an attorney during that time.
The trial judge found that the appellant was properly advised of his constitutional rights under Miranda and that the confession was free and voluntary. The evidence overwhelmingly supports the finding of the trial judge and there is no merit in this assignment of error. Harrigill v. State, 381 So.2d 619 (Miss. 1980); Curry v. State, 328 So.2d 328 (Miss. 1976); and Clemons v. State, 316 So.2d 252 (Miss. 1975).

III.
Did the lower court err in admitting into evidence, over timely objection, certain items claimed to be "fruit of the poisonous tree?"
The appellant contends that the evidence found by the officers as a result of the confession and appellant's leading them to it, was "fruit of the poisonous tree," citing Wong Sun v. United States, 371 U.S. 471, *760 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), because the confession was inadmissible.
Since we hold that the confession was admissible and there is no merit in Assignment II, this assignment likewise is without merit.

IV.
Was the testimony of Coroner Roger Jones as to the findings of the coroner's jury prejudicial?
Appellant contends that the court erred in admitting certain testimony of Coroner Roger Jones as to the cause of Mr. Turner's death. That testimony follows:
Q. You held a Coroner's Inquest?
A. Yes, sir.
Q. Was the cause of death determined?
A. Cause of death was determined by the Jurors. It was a gunshot wound to the chest.
Q. Did you as County Coroner sign the Certificate of Death of J.B. Turner?
A. Yes, sir. I did.
Q. On that Certificate of Death, there's a portion for cause of death. Was that filled in by you?
A. Yes, sir.
Q. And, what was the cause of death certified by you on the Certificate of Death?
A. Gunshot wound to the chest.
Q. Mr. Jones, were you able to determine the type of gun  whether it was a rifle or a shotgun?
A. Yes, sir. It was a shotgun.
The verdict of a coroner's jury is not admissible in evidence on the trial of a defendant charged with murder. In Blackwell v. State, 166 Miss. 524, 529, 146 So. 628, 629 (1933), this Court said:
[T]he general rule is that the finding of a coroner, or the verdict of a coroner's jury as to the manner and cause of the death of the deceased, is not admissible in evidence for any purpose.
The testimony by the coroner that "Cause of death was determined by the Jurors. It was a gunshot wound to the chest." was inadmissible. However, the error was harmless because other evidence in the case, both direct and circumstantial, established beyond reasonable doubt that the death of Mr. Turner was proximately caused by a gunshot wound to the chest. Cause of death may be established not only by a physician or pathologist, but by lay and circumstantial evidence.

V.
Did the lower court err in admitting into evidence, over objection, a picture of the appellant?
When the officers accompanied appellant to the place where he discarded the money bag taken from Mr. Turner, he was handcuffed and a restraint chain was placed around his waist and legs. When appellant found the spot where the money bag lay, the officers took a photograph of him pointing to the money bag. Appellant contends that the photograph was prejudicial because it indicated to the jury that appellant was dangerous. (He was handcuffed and in chains).
We do not think that the photograph constitutes a tabloid as has been held in some cases where individuals not connected with a crime are shown holding, or pointing, to an item of evidence. The record indicates that when the officers left with appellant, it was a customary police caution to handcuff and chain the prisoner for the protection of the officers and him. The photograph showed no more than the testimony indicates. It had probative value in corroborating appellant's confession and in showing his cooperation with the investigating officers to find the item of evidence. Wall v. State, 413 So.2d 1014 (Miss. 1982).

VI.
Did the lower court err in admitting two photographs of deceased's body to corroborate the coroner's testimony?
Appellant last contends that photographs of Mr. Turner's body prejudiced the jury against him and that the court erred in admitting them in evidence.
*761 The photographs had probative value. They showed the location, kind and condition of the wounds on Mr. Turner's chest and back, and were relevant to the cause of death and the manner in which the wounds were inflicted.
We are of the opinion that the lower court did not abuse its discretion in admitting the photographs in evidence. Hubbard v. State, 437 So.2d 430 (Miss. 1983); Hill v. State, 432 So.2d 427 (Miss. 1983); Palmer v. State, 427 So.2d 111 (Miss. 1983); Shearer v. State, 423 So.2d 824 (Miss. 1982).
The judgment of the lower court on the guilt phase is affirmed.
AFFIRMED.
PATTERSON, C.J., WALKER and BROOM, P.JJ., and BOWLING, HAWKINS, DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.

PART II

SENTENCING PHASE
DAN M. LEE, Justice, for the Court:
Wiley has assigned only one error in regard to the sentencing phase of his trial. He argues that the prosecutor improperly commented on the reviewability of the death sentence during closing arguments to the jury. Because we find merit in this argument we must reverse Wiley's sentence of death and remand this cause for a new trial on the sentencing phase alone.
During the prosecutor's initial remarks of his final argument he made the following statement:
Now I don't know what Mr. Franks [the defense attorney] will say. He'll probably attempt to put you gentlemen in the role of a hangman. I don't know, but the lawyers that I've tried cases against in the past have done it and that's unfair because you're not. (Emphasis added)
Following the prosecutor's initial argument, defense counsel responded with an argument which included the following:
I want you to remember that if he's sentenced to life in prison, you're not giving him life, you would be sentencing him to spend the rest of his life in prison in Parchman, Mississippi. That is not letting somebody off. I don't care what Mr. Williams will call it, I don't care how he wants to phrase it, that is not letting somebody off... . When you get through there's not going to be somebody to walk up to you and say, "Yes, you made the correct verdict," or "No, you made an incorrect verdict." It's your decision and one that you will have to live with. You vote for  you vote to have William Wiley executed, you're going to have to live with that. You are also going to have to live with it, if you don't. If you vote to send him to prison for the rest of his life, that's something else you're going to have to live with.
These comments were followed by the prosecutor's final argument in which he stated:
He [defense counsel] tells you, and I wrote his words down, that the State wants to kill a man and that you'll have to live with this the rest of your life. He's attempting to put you in the role of a hangman. It's unfair. It's totally unfair. He knows just as well, like I know and every other person that's familiar with the Court system, that any decision you render is automatically reviewable.
At this point the defense counsel objected and moved for a mistrial. The trial judge overruled the objection and denied the motion.
This issue is a point we have written on many times in the past months; but, in an effort to make absolutely clear the intent of our holdings, we will again discuss the subject at some length.
In California v. Ramos, ___ U.S. ___, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), the United States Supreme Court held that informing a jury of the governor's power of commutation does not deprive a defendant of a fair trial. This holding was a cautious one in that it addressed only the commutation issue and, more importantly, expressly *762 reserved to the individual states the right to determine what post-sentencing matters are properly placed before a jury. Therefore, the Ramos decision provides us no guidance other than pointing to the direction of the forest; we are free to choose our own path.
The path chosen as the law of this state is the one, which, in our opinion, will prove to lead most directly to a fair determination on the issue of sentencing. Our course was set in Howell v. State, 411 So.2d 772 (Miss. 1982), wherein we held that a prosecutor's argument which informed the jury that their verdict was subject to a right of appeal constituted reversible error. The rationale of the Howell decision is designed to secure the individual juror's sense of responsibility for the fate of the accused.
In Hill v. State, 432 So.2d 427 (Miss. 1983), our holding followed the Howell path but we failed to reverse because of a procedural bar, i.e., failure of Hill's attorney to object at trial to the improper comments. The procedural bar notwithstanding, we used strong language to indicate that arguments such as the one now before us are highly disapproved of and not good practice:

Any argument by the state which distorts or minimizes this solemn obligation and responsibility of the jury is serious error. Every attorney knows the jury verdict is indeed the last word on a factual dispute. Neither the circuit judge nor this Court is authorized to set aside a jury verdict on conflicting evidence, or a disputed factual issue. Moreover, in a death penalty case a jury should never be given false comfort that any decision they make will, or can be, corrected.

In Howell v. State, 411 So.2d 772 (Miss. 1982), which was not a death penalty case, we condemned a "last word" argument.
A prosecutor making this sort of argument is asking for a mistrial. (Emphasis added). [432 So.2d at 439].
The rationale of these decisions holds true today and we will not here waiver from its course. The role of juror in a capital murder trial brings with it an awesome responsibility. Fortunately, few of us are ever required to make the decision whether to end another human being's life; however, that is precisely the question confronting jurors following a guilty verdict in a capital case. Such decision is so ominous that it becomes almost trite to attempt to assess the introspection, concern, and solemnity that accompany it.
Because of the importance of the jurors' deliberations we must be cautious in avoiding any actions which tend to reduce the jurors' sense of responsibility for their decision. They must not be permitted to look down the road for someone to pass the buck to. Arguments by a prosecutor which relate the reviewability of a jury's verdict have exactly this dangerous effect. Jurors faced with the portentous duty of deciding an accused's fate will take comfort in the fact of review. They may view their role as merely advisory, a view that can prove fatal to an accused.
Under our law the jury is the sole player in the judicial process who may vote to send an accused to die. They alone make that determination and all review is then conducted with a presumption of its correctness. While a jury is not literally "the hangman," only they may supply the hangman's victims. All notions of justice require that the jurors as individuals, and as a body, recognize and appreciate the gravity of their role.
It has been argued that the prosecutor's comments in the instant case were invited when defense counsel argued that the jury should vote to sentence Wiley to "spend the rest of his life in prison in Parchman, Mississippi." This notion is meritless. The only statutory alternative to imposition of the death sentence is life imprisonment. Miss. Code Ann. § 99-19-101 (Supp. 1983). What twisted bit of logic it would be for us to hold that the defense counsel's sole argument to save his client's life is an invitation to error.
We conclude by noting the atrociousness of the crime William Wiley stands convicted *763 of and the dedication of the prosecutors who seek to bring him and others like him to justice. There is no member of this Court who would not be loathe to see a vicious murder go unpunished, but that is not the point. We are here addressing the means by which we select and impose the punishment. Those means must not be tainted for they then become unjust and we surrender the very mandate which empowers us to pass judgment.
Nearly a century ago Justice Woods eloquently phrased the message behind today's holding:
The fair way is the safe way, and the safe way is the best way in every criminal prosecution. The history of criminal jurisprudence and practice demonstrates, generally, that if every one prosecuted for crime were fairly and fully conceded all to which he is entitled, and if all doubtful advantages to the state were declined, and if adventurous forays into dangerous or unknown fields were shunned, and if the beaten paths were heedfully followed, there would be secured as many convictions of the guilty, and such convictions would be succeeded by few or no reversals. Hill v. State, 72 Miss. 527, 17 So. 375 (1895).
Therefore, in applying Justice Woods' premise we are compelled to reverse Wiley's death sentence. Further, we admonish prosecutors throughout the state that the convictions they strive to achieve are secure only when they confine themselves to argument tolerated under our rules of criminal jurisprudence. To step behind these rules, as did the argument in this case, is asking for a mistrial.
Based on the foregoing, the judgment of the lower court on the guilt phase is affirmed; however, the death sentence imposed at the conclusion of the sentencing phase is reversed and remanded for a new trial on the sentencing phase only.
REVERSED AND REMANDED AS TO THE SENTENCING PHASE ONLY.
PATTERSON, C.J., and HAWKINS, PRATHER and ROBERTSON, JJ., concur.
ROY NOBLE LEE, J., WALKER and BROOM, P.JJ., and BOWLING, J., dissent.
ROY NOBLE LEE, Justice, dissenting as to Part II:
I think that the verdict of the jury and judgment of the lower court in imposing the death penalty on appellant should be affirmed and, therefore, I dissent from the majority opinion in the sentencing phase of the trial.
In order that we may examine the language of the defense attorney and the prosecuting attorney, in comparison, just as an expert examines two items of physical evidence on a microscope for comparison, I set forth the objectionable argument made by those attorneys. Appellant's attorney stated the following:
Regardless of your verdict either way, it is something that you're going to have to live with the rest of your life, and we told you this isn't a T.V. show and it's not. When you get through, there's not going to be somebody to walk up to you and say, "Yes, you made the correct verdict," or "No, you made an incorrect verdict." It's your decision and one that you will have to live with. You vote for  you vote to have William Wiley executed, you're going to have to live with that. You are also going to have to live with it, if you don't. If you vote to send him to prison for the rest of his life, that's something else you're going to have to live with. That is something that is never going to go away.

* * * * * *
... I want you to remember that. I want you to remember that if he's sentenced to life in prison, you're not giving him life, you would be sentencing him to spend the rest of his life in prison in Parchman, Mississippi. This is not letting somebody off.

* * * * * *
... I contend that you should do for yourself and your God and the people in *764 your community, sentence this boy to prison for the rest of his life, but not to kill him. That would be wrong. Absolutely wrong. (Emphasis added)
In the prosecutor's closing argument, responding to the argument of appellant's attorney, the following comment was made:
Now, it's not unusual and I told you it was going to happen, to try to put the jury in the role of a hangman in these type cases. He tells you, and I wrote his words down, that the State wants to kill a man, and that you'll have to live with this the rest of your life. He's attempting to put in the role of a hangman. It's unfair. It's totally unfair. He knows just as well, like I know and every other person that's familiar with the Court system, that any decision you render is automatically reviewable. (Emphasis added)
The majority opinion cites Howell v. State, 411 So.2d 772 (Miss. 1982), as prime authority for reversing the sentence of Wiley in the present case. Howell was convicted of armed robbery and was sentenced to eight (8) years with the Mississippi Department of Corrections. It is distinguished from this case. In closing argument, the district attorney stated five times in succession that a higher court would pass upon the case and that the jury verdict was not final. The statement was objected to by Howell's attorney and was sustained each time. Yet, amazingly, the prosecuting attorney disregarded the ruling of the court and made the statement four additional times. They follow:
(1) Let me say this to you, Ladies and Gentlemen, your decision, if you find him guilty, will not be final ... There is a court above this that will look at this and see if you all made the right decision.
(2) The Supreme Court of the State of Mississippi has a right to look at this case and see if the laws have been followed in this case.
(3) He has the right to appeal and have another panel of judges, solely, to look at this issue. If they find that it wasn't done properly, they will send it back or they can turn him loose, up there, if they find that ...
(4) You are not the final judges of this, and if he appeals it, he has the right to be out on bond... .
(5) So they, you are not going to be the final judges. You are going to make a decision here in a short time as to what the verdict should be in this case, based upon the evidence that has come to you.
The Howell court specifically commented that the district attorney made an inaccurate statement of the law, which was misleading to the jury, when he said that the jury was not the final judge of the case and that Howell had the right to be out on bond, if he appealed, which was incorrect. The Howell court simply found that Howell did not receive a fair trial because of the continued and emphatic statements of the district attorney in complete disregard of the ruling of the court.
In Evans v. State, 422 So.2d 737, 746 (Miss. 1982),[1] responding to the argument of Evans' attorney, the district attorney made the following statement: "You can sentence a defendant to life imprisonment but that's your sentence ... that's just your sentence, ... ."
Evans argued that the statement was an insinuation that, if the jury fixed the sentence at life, appellant would not serve life in the penitentiary. In holding that the statement was not reversible error, we said that, if the argument was improper, then it could be said the appellant's attorney provoked the comment in response to his argument.
In Gilliard v. State, 428 So.2d 576, 583 (Miss. 1983), Gilliard's attorney argued that approximately two weeks prior to the capital murder trial, Gilliard was convicted of an armed robbery and received a sentence of thirty years, and, that if the jury in the capital murder case saw fit to give Gilliard life, he would be serving thirty years plus life. In answer to that argument, the district *765 attorney said, "It doesn't work like that about how long you are at the penitentiary, and he knows as well as I do, life is ten years and you are eligible then for parole."
We held that the remarks of the defense attorney in this death penalty case amounted to provocation, caused the district attorney to respond as he did, and that the error did not require reversal.[2]
In Edwards v. State, Miss.Sup.Ct. No. 53,800, 441 So.2d 84, Aff'd as to Guilt, Rev'd as to Sentence March 16, 1983,[3] Pet. Reh. Den'd December 14, 1983 [Not Yet Reported], the question was before the Court again. In response to Edwards' counsel saying that Edward would be in the penitentiary for the rest of his life, if so sentenced by the jury, the prosecuting attorney said:
And believe me, Mr. Stanfield nor I neither one knows what that means. He said to you that it meant  he said to you in this language: "Life imprisonment is the only answer. Let's send him up there and let him stay there forever." But he didn't tell you that we are going to do that 
* * * * * *
... All he said was that's the answer. And maybe it is if that were so, but we don't know that that's so.
... Mr. Stanfield has not told you that putting him in life imprisonment is going to keep him up there permanently, even though he would have you to believe that by saying that's the only answer.
In Edwards, the Court held that Edwards' attorney invited the remarks from the district attorney and that such remarks did not constitute reversible error.
There are presently pending before this Court three capital murder cases where the death penalty was imposed and which have been argued, e.g., Walter Williams v. State, Miss.Sup.Ct. No. 54,294; Arthur Ray Lanier v. State, Miss.Sup.Ct. No. 54,208; and Gregory Montecarlo Jones v. State, Miss.Sup.Ct. No. 54,067. In addition, the case of John Earl Booker v. State, Miss.Sup.Ct. No. 54,696, is pending, but has not been argued. The same question appears in those cases.[4]
Therefore, four capital murder cases, where the death penalty has been imposed, may or may not be controlled by this Court's decision on the same question, which the majority is reversing on the sentencing phase. In my opinion, a comparison of the error claimed in the case sub judice and those mentioned hereinbefore points out that the argument does not constitute reversible error here, and that it should be affirmed also on the sentencing phase.
The State, relying upon California v. Ramos, ___ U.S. ___, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), urges that we recognize real differences in the guilt and sentencing phases of a capital murder trial and permit open view of all factors pertinent to sentencing, such as commutation or parole. However, I am unwilling to go that far, and to that extent, at the present time. I think that we must examine each record as it comes before us to determine whether or not on that record the appellant has received a fair trial and, on the particular point here, whether or not remarks or statements of the prosecuting attorney have resulted in prejudice to him to the extent that he did not obtain a fair trial. In my opinion, the present question passes muster.
The majority opinion refers to the awesome responsibility of jurors in a death case. In my view, the duty and responsibility of jurors in such cases are healthy and *766 vibrant parts of our criminal judicial system. They are not duties and responsibilities to cringe from and to shirk upon flimsy excuses. The victim in a capital case, who has been robbed and brutally murdered, and civilized society, which has been violated and outraged, should not be looked upon as the "forgotten man." Likewise, they deserve consideration and are entitled to share in the proper exercise of jurors' duties and responsibilities. The State of Mississippi and its people, also, are entitled to a fair trial!
For the reasons stated, I would affirm imposition of the death penalty and I dissent from the majority opinion on Part II, the sentencing phase.
WALKER and BROOM, P.JJ., and BOWLING, J., join in this dissent.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[1] Death penalty imposed and affirmed.
[2] Hill v. State, 432 So.2d 427 (Miss. 1983) is not authority for the question here. In that case, the district attorney said, "They know your word is not the last word. They know that." There was no objection to the statement of the prosecuting attorney and the point was not preserved for appellate review.
[3] Reversed on other grounds.
[4] Appellee's Brief, at 8, sub judice.