## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-DR-01317-SCT

*WILLIAM L. WILEY*

*v.*

*STATE OF MISSISSIPPI*


| DATE OF JUDGMENT: | 2/3/1995 |
| --- | --- |
| TRIAL JUDGE: | HON. ANDREW C. BAKER |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JAMES McLAUGHLIN |
| | ROBERT B. McDUFF |
| | MARK E. FELDMAN |
| | TIMOTHY C. HESTER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  MARVIN L. WHITE, JR. |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | WILLIAM L. WILEY'S APPLICATION FOR LEAVE TO FILE MOTION TO VACATE DEATH SENTENCE ON THE BASIS OF ATKINS V. VIRGINIA, 536 U.S. 304 (2002), DENIED - 08/26/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**EASLEY, JUSTICE, FOR THE COURT:**

### STATEMENT OF THE CASE

¶1.     William L. Wiley (Wiley) was charged with capital murder in a DeSoto County robbery that left store owner J.B. Turner dead and his daughter seriously injured as well as blind.[1]  Wiley lay in wait for

---

[1]The complete factual scenario is set out in *Wiley v. State*, 449 So.2d 756 (Miss. 1984).

some time outside the store for Turner and his daughter and then shot and robbed them as they were closing the store. The sawed-off shotgun used in the murder was traced to Wiley, who was later arrested and subsequently confessed. Wiley was tried, convicted, and sentenced to death in 1982.

¶2. On direct appeal his conviction was affirmed by this Court, but the case was remanded for re-sentencing because of comments made by the prosecutor regarding appellate review. *Wiley v. State*, 449 So.2d 756 (Miss. 1984). Wiley was again sentenced to death in 1984, and this Court affirmed the case. *Wiley v. State,* 484 So.2d 339 (Miss. 1986). His petition for rehearing was denied by this Court as was his petition for writ of certiorari to the United States Supreme Court. *Wiley v. Mississippi,* 479 U.S. 906, 107 S.Ct. 304, 93 L.Ed.2d 278, *reh'g denied*, 479 U.S. 999, 107 S.Ct. 604, 93 L.Ed.2d 604 (1986). Thereafter, Wiley filed a petition for post-conviction relief that was denied by this Court. *Wiley v. State,* 517 So.2d 1373 (Miss. 1987). His motion for rehearing was denied, and again the United States Supreme Court declined review of the case. *Wiley v. Mississippi*, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 610, *reh'g denied*, 487 U.S. 1246, 109 S.Ct. 6, 101 L.Ed.2d 957 (1988).

¶3. Wiley then filed a petition for a writ of habeas corpus that was denied by the U.S. District Court via unpublished opinion. He appealed to the U.S. Court of Appeals for the Fifth Circuit which held that Wiley's death sentence was improper because the sentencing jury was improperly instructed as to the "especially heinous, atrocious or cruel" aggravating circumstance. *Wiley v. Puckett,* 969 F.2d 86 (5th Cir. 1992). This Court remanded for a new sentencing hearing. *Wiley v. State,* 635 So.2d 802 (Miss. 1993). In 1995, Wiley was again sentenced to death. Wiley appealed, and this Court affirmed. *Wiley v. State,* 691 So.2d 959 (Miss. 1997), *reh'g denied,* 693 So.2d 384 (Miss. 1997)(motion for

substitution of counsel granted),*cert. denied*, **Wiley v. Mississippi**, 522 U.S. 886, 118 S.Ct. 219, 139 L.Ed.2d 153 (1997).

¶4. Also in 1997, Wiley filed a pro se motion to stay execution and to appoint an attorney in the United States District Court. The district court denied the motion in an unpublished order. He appealed to the Fifth Circuit, which entered an unpublished order staying the execution and remanding the case to the district court. On January 16, 1998, the district court appointed Thomas Levidiotis (Levidiotis) as counsel and ordered that the habeas petition be filed within sixty (60) days. Shortly thereafter, Robert B. McDuff (McDuff), present counsel, filed a motion to vacate the appointment of Levidiotis and substitute himself as counsel without payment which was granted by the district court.

¶5. McDuff and Timothy C. Hester, Brian Miller and Anthony Picarello, Jr., of the Washington, D.C., firm of Covington & Burling, then filed a motion for post-conviction relief on Wiley's behalf that was denied by this Court in June of 1999. **Wiley v. State**, 750 So.2d 1193 (Miss. 1999). His motion for rehearing was denied, and the United States Supreme Court denied certiorari. **Wiley v. Mississippi**, 530 U.S. 1275, 120 S.Ct. 2742, 147 L. Ed. 2d 1007 (2000). Also in June of 1999, McDuff and counsel filed a motion for appointment of compensated counsel and funding for litigation expenses, but it was denied by this Court in January of 2000. Wiley then filed an Application for Leave to file Motion to Vacate Death Sentence seeking collateral review of the denial of his motion for appointment of compensated counsel and litigation funding, and asking for leave to present new claims of ineffective assistance of counsel. This Court denied the application. **Wiley v. State**, 842 So.2d 1280 (Miss. 2003). Wiley apparently still has a petition for habeas corpus pending in the U.S. District Court.

¶6. On June 19, 2003, Wiley filed a successive application for leave to file a motion to vacate the death sentence based on the U.S. Supreme Court decision in **Atkins v. Virginia**, 536 U.S. 304, 122 S. Ct.

2242, 153 L. Ed. 2d 335 (2002). Wiley asserts that *Atkins* is an intervening decision affecting a fundamental right and allows him to seek relief on the basis that he is mentally retarded and no longer eligible for imposition of the death penalty. We find that Wiley's claim is without merit and that the application should be denied.

## ANALYSIS

¶7.     In *Atkins*, 122 S. Ct. 2242, the United States Supreme Court determined that imposition of the death penalty on mentally retarded inmates constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. The *Atkins* decision did not define who is or is not mentally retarded for purposes of eligibility for a death sentence but instead "leave[s] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." 122 S. Ct at 2250.

¶8.     In *Foster v. State*, 848 So.2d 172 (Miss. 2003), it was alleged that Ron Chris Foster had an IQ score of 80 from a test done at Whitfield in 1990, but the source of this score could not be found in the appeal record. This Court found that IQ alone was not determinative under *Atkins*. Foster had the following scores on the Wechsler test in December 2002, just before his scheduled execution: verbal IQ of 68, performance score of 59 and a full scale score is 62. He further produced evidence to the effect that he had always been in special or remedial classes. Dr. Marc Zimmerman, who administered the tests, stated that the results were "consistent with a diagnosis of mental retardation." *Foster*, 848 So.2d at 174. This Court granted leave to proceed in the trial court on the issue of mental retardation and provided the following standards:

> To that end the standard or definition of mental retardation shall be that enunciated by the Supreme Court in *Atkins*, especially the American Psychiatric Association's definition of mental retardation. American Psychiatric Association, Diagnostic and Statistical Manual

4

of Mental Disorders IV 39-46 (4th ed.1994). We further hold that the Minnesota Multiphasic Personality Inventory-II (MMPI-II) is to be administered since its associated validity scales make the test best suited to detect malingering. *See* ***id***. at 683 (defining malingering as the "intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs"). *See also* ***United States v. Battle***, 235 F.Supp.2d 1301, 1307 (N.D.Ga.2001) (explaining MMPI and its validity scales and stating that "[t]he MMPI is generally agreed to be difficult to cheat on without getting caught"). Foster must prove that he meets the applicable standard by a preponderance of the evidence pursuant to Miss. Code Ann. §§ 99-39-23(7). This issue will be considered and decided by the circuit court without a jury.

*Foster*, 848 So.2d at 175.

¶9. Mental retardation is defined by the American Psychiatric Association as significantly sub-average general intellectual functioning accompanied by significant limitations in adaptive functioning in two skill areas, such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety.[2] The onset of this must occur before age 18. The American Psychiatric Association also provides that mild mental retardation is typically used to describe someone in the IQ range of approximately 50 to 70.[3]

¶10. In ***Russell v. State***, 849 So.2d 95 (Miss. 2003), Willie Russell was found by one doctor to have a full scale IQ of 68, which indicated that Russell was functioning within the upper range of the mildly mentally retarded category of intelligence. Another doctor testified that Russell's IQ was 76, "borderline to low normal," and that he was not retarded. Evidence was also presented concerning Russell's life before and during his imprisonment. Russell too was granted leave to proceed on this lone issue.

---

[2] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000).

[3] *Id*. at 42-43.

¶11.    In *Goodin v. State*, 856 So.2d 267 (Miss. 2003), Howard Goodin relied on evidence which showed that he had a verbal IQ of 65, a performance IQ of 60, for a full scale IQ 60 on the Wechsler Test. On the Shipley test, Goodin had obtained an estimated IQ of 50, within the mildly mentally retarded range. Goodin could read at a second grade level and do math at a first grade level. The trial court reported Goodin's intelligence level was "low (IQ below 70)." Goodin produced school records showing poor performance and affidavits from relatives discussing his strange behavior. The State relied on evidence showing that Goodin had intentionally not done as well as he was capable on the IQ tests, that he had no significant neuropsychological problems, and that his behavior during the shooting/robbery at issue and on the witness stand at trial undermined his claim of retardation. This Court nonetheless granted Goodin leave to proceed in the trial court on this issue.

¶12.    More recently, this Court remanded *Carr v. State*, 873 So.2d 991 (Miss. 2004), to the trial court for an evidentiary hearing to determined whether Carr is still eligible for the death penalty. Carr scored in the mildly mentally retarded range on the WAIS-R (Performance IQ=63; Verbal IQ=72; Full Scale IQ=70). However, the Court also held that the trial court has discretion to limit the scope of the evidentiary hearing based on the thoroughness of a prior evaluation.

¶13.    In *Chase v. State*, 873 So.2d 1013 (Miss. 2004), this Court granted Chase's application to proceed in the trial court on the issue of his alleged mental retardation. In doing so, this Court held:

> **[N]o defendant may be adjudged mentally retarded** for purposes of the Eighth Amendment, **unless** such defendant produces, **at a minimum**, an expert who expresses an opinion, to a reasonable degree of certainty, that:
>
> 1.    The defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association;
> 2.    The defendant has completed the Minnesota Multiphasic Personality Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering.

*Chase*, 873 So.2d at 1028 (emphasis added). Chase scored a Performance IQ of 64, a Verbal IQ of 77 and a Full Scale IQ of 71. Chase also submitted an affidavit from a psychiatrist stating that he suffers from mild mental retardation.

¶14. In the case sub judice, Wiley asserts that in May of 2003 he was tested by Dr. Daniel Grant and scored a Performance IQ of 68, a Verbal IQ of 73 and a Full Scale IQ of 68 on the Wechsler Adult Intelligence Scale - III (WAIS-III). He attaches an affidavit from Dr. Grant that his Full Scale IQ of 68 places his level of intelligence within the mentally retarded range. Dr. Grant further asserts that Wiley meets the other two definitional criteria for mental retardation in that he has deficits in adaptive behavior in at least two defined areas and that the manifestation of mental retardation was by age 18. Wiley asserts that he has severe deficits in adaptive behavior in communication, functional academics and health and safety.

¶15. Prior to 2003, Wiley was tested in 1987 and 1994 under the Wechsler Adult Intelligence Scale - Revised (WAIS-R) exam by Dr. Billy R. Fox. Wiley asserts that in 1987 he scored a Verbal IQ of 75, a Performance IQ of 72 and a Full Scale IQ of 73. Dr. Fox concluded that Wiley's Full Scale score placed him in the borderline mentally retarded range. In 1994, Wiley scored a Verbal IQ of 74, a Performance IQ of 83 and a Full Scale IQ of 78. Dr. Fox concluded that Wiley was "within the borderline mentally retarded range with slightly better developed and/or functioning performance than verbal abilities."

¶16. Wiley attaches school records indicating that he performed poorly throughout school, that he repeated the fifth and sixth grades and that he dropped out after the eighth grade. Wiley asserts that these school records establish the manifestation of mental retardation by age 18. However, the school records also indicate that Wiley had a very poor attendance record, missing 59 days in one year, 36 in another and still 31 in another, and that he actually repeated the sixth grade because he dropped out the first time. Wiley's attendance record reflects that his best academic performance occurred in the sixth grade when

7

he had only ten absences, which was the least number of his academic career. Further, there is no indication that Wiley was in special education classes. Also, there is an affidavit from Wiley's grandmother, JoAnn Butler, with whom he lived and who characterizes Wiley's academic achievements by saying he did "pretty well in school." Both Wiley and Butler represent that Wiley quit school to go to work.

¶17. The State does not contest that *Atkins* is an intervening decision, but asserts that Wiley does not meet the test set out by this Court to determine whether he is mentally retarded and therefore not subject to the death penalty. The State asserts that any test done post-*Atkins* should automatically be suspect when prior test results did not demonstrate retardation. The State also questions the credentials of Dr. Grant and attaches an article detailing a scandal involving one of the organizations granting him certification. The State asserts that the affidavits and reports reviewed by Dr. Grant are already on file with this Court as attachments to pleadings in 1987 and 1993 and that they totally discredit the notion that Wiley is retarded. The affidavits of Wiley's friends and relatives assert that Wiley was a good husband, father, son and grandson, that he was a good, reliable worker with steady employment at various employers, that he performed household maintenance, repaired automobiles, babysat children, ran errands, supported his family and did numerous other things. Wiley was also in the Army until injuring his leg and getting honorably discharged. The State asserts that the affidavits do not allege or establish that Wiley is mentally retarded. We agree.

¶18. In his last motion for post-conviction relief, Wiley argued that he received ineffective assistance of counsel because his attorney did not present certain mitigating evidence.[4] Wiley did assert that his counsel failed to present evidence of various mitigating factors, including that he had suffered a head injury, been

---

[4]*Wiley v. State*, 842 So.2d 1280 (Miss. 2003).

exposed to traumatic events, and did poorly in school. However, there was no suggestion that his counsel failed to present mitigating evidence that Wiley is mentally retarded and ineligible for the death penalty. This Court found that issue to be without merit and that any relevant testimony was introduced by other witnesses. There was also evidence introduced that Wiley spends a great deal of his prison time studying the Bible, reading and writing to pen pals.

¶19.    In an earlier motion for post-conviction relief, Wiley argued that the trial court erred in failing to instruct the jury on the mitigating factor of diminished capacity.[5]  Wiley asserted:

> The evidence in this case provided more than sufficient basis for a rational jury to infer, by a mere preponderance of the evidence, that Wiley suffered from diminished capacity at the time of the shooting: Wiley had suffered head injuries as a child, had an I.Q. below 80, and had been drinking and taking drugs soon before the shooting.

Wiley had previously raised this same argument on direct appeal, and this Court rejected it.

¶20.    Now Wiley apparently wants this Court to disregard the prior evidence and find that he is mentally retarded. The prior evidence does not support Wiley's claim that he is retarded, and we agree with the State's following characterization:

> These reports, affidavits and testimonies do not paint the picture of a retarded person. Simply because retarded people do not operate heavy machinery, retarded people do not drive tractors, retarded people do not hold jobs for much longer than a year at a time, much less work two jobs at a time, retarded people are not admitted to the radio operator school of the Army, retarded people do not get drivers licenses, buy cars and drive cars. Further, retarded people do not support families and see to it that all the bills are paid, retarded people do not see to the care of others and make sure they have enough money, a nice house, and school clothes.

---

[5]*Wiley v. State*, 750 So.2d 1193 (Miss. 1999).

¶21. This Court spoke of evolving standards in *Chase*, 873 So.2d at 1024. We now find it necessary to expand on the procedure to be used in reaching a determination of mental retardation by holding that this Court will consider the entire record before it in deciding whether to grant an *Atkins* hearing.

¶22. The standard set out by this Court in *Chase,* 873 So.2d at 1028, and cited herein establishes the minimum requirements for a person to be adjudged mentally retarded. This Court said "[n]o defendant may be adjudged mentally retarded. . . unless" that defendant produces an expert opinion that the defendant is retarded and has completed the MMPI-II. That does not mean that every defendant who submits an expert opinion to this Court and has completed the MMPI-II will be adjudged mentally retarded for the purposes of *Atkins*. Further, Wiley does not even assert that he has completed the MMPI-II or some similar test to show that he is not malingering. There is a mention of the MMPI-II in the 1987 affidavit of Dr. Fox, but nothing in this most recent motion.

¶23. As stated previously, mental retardation is defined as significantly sub-average general intellectual functioning accompanied by significant limitations in adaptive functioning in two skill areas, the onset of which occurred before age 18. At best, Wiley and his experts allege borderline mental retardation. Wiley also asserts significant limitations in adaptive functioning. However, the affidavits, testimony and statements of Wiley and his friends and family, overwhelmingly dispute such an assertion. Wiley asserts that the onset of his mental retardation occurred before age 18. However, Wiley was first tested in 1987 when he was almost 33 years old. Wiley argues that his school records establish manifestation before age 18. We find that Wiley's school records are not sufficient to establish mental retardation. Further, we find that the overwhelming weight of the evidence resolves the issue of borderline intelligence and shows that Wiley was not mentally retarded before age 18. The record shows that Wiley was a normal, productive citizen, who

10

was never characterized as "mentally retarded" until such time as being mentally retarded became critically important in the realm of post-conviction relief.

## CONCLUSION

¶24. Wiley presents insufficient evidence that he suffers from significantly sub-average general intellectual functioning accompanied by significant limitations in adaptive functioning in two skill areas, the onset of which occurred before age 18. Accordingly, we deny William Wiley's Application for Leave to File Motion to Vacate Death Sentence on the basis of *Atkins v. Virginia*, 536 U.S. 304 (2002).

¶25. **WILLIAM WILEY'S APPLICATION FOR LEAVE TO FILE MOTION TO VACATE DEATH SENTENCE ON THE BASIS OF ATKINS V. VIRGINIA, 536 U.S. 304 (2002), DENIED.**

**SMITH, C.J., WALLER, P.J., CARLSON AND RANDOLPH, JJ., CONCUR. COBB, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, J. DIAZ AND GRAVES, JJ., NOT PARTICIPATING.**

**COBB, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶26. I agree with the majority's position that this Court will always consider the entire record before it in deciding whether to grant an *Atkins/Chase* evidentiary hearing. I also agree that in certain cases there may exist overwhelming weight of the evidence which would enable us to resolve the issue of mental retardation without granting such a hearing. However, in my view, the present case simply is not such a case.

¶27. I write separately to note my disagreement with the majority's conclusion that, based on the record before us, the overwhelming weight of the evidence compels this Court to find that Wiley is not mentally retarded, thus conclusively denying his motion to vacate his death sentence. In essence, the majority

11

abandons our carefully written standards and procedures set forth in *Chase v. State*, 873 So. 2d 1013 (Miss. 2004), and goes too far in substituting the Court's evaluation of the evidence and determination that Wiley is not mentally retarded, for the evaluation and determination to the contrary by professional psychologists trained in psychological and mental retardation evaluation procedures.

¶28.    In *Chase,* this Court said:

> We hold that no defendant may be adjudged mentally retarded for purposes of the Eighth Amendment, unless such defendant produces, at a minimum, an expert who expresses an opinion, to a reasonable degree of certainty, that: 1. The defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association; [and] 2. [t]he defendant has completed the Minnesota Multi phasic Personality Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering.

*Id.* at 1029.

¶29.    Further, we said that as a prerequisite to an evidentiary hearing on the issue of mental retardation, the defendant must attach to his motion (or petition, as the case may be) an affidavit from at least one expert, "qualified as an expert in the field of assessing mental retardation, and further qualified as an expert in the administration and interpretation of tests, and in the evaluation of persons, for purposes of determining mental retardation." See *id.* (¶75). This affidavit shall state "to a reasonable degree of certainty, that: (1) the defendant has a combined Intelligence Quotient ("IQ") of 75 or below, and; (2) in the opinion of the expert there is a reasonable basis to believe that, upon further testing, the defendant will be found to be mentally retarded, as defined [in ¶¶ 69-70]." *Id.* (¶79).

¶30.    Wiley's motion relies in large part upon two affidavits, one presented by Dr. Daniel H. Grant, a licensed psychologist, who has an Ed. D. in school psychology from the University of Georgia in 1981, with minors in mental retardation and reading. The other was presented by Billy R. Fox, Ph.D., a licensed clinical/counseling psychologist who has been practicing for 24 years. While Dr. Grant addressed to some

12

degree all the *Atkins/Chase* requirements, Dr. Fox only mentioned the IQ tests he had administered to Wiley in 1987 and 1994. Both his examinations of Wiley were only for purposes of determining IQ, using the Wechsler Adult Intelligence Scale-Revised (WAIS-R), the then prevalent Wechsler IQ test, which was supplanted in 1997 by the WAIS-III test administered by Dr. Grant.

¶31.    Dr. Grant interviewed and tested Wiley at the state penitentiary at Parchman, over a period of two days, in May 2003, assessing his level of intelligence, adaptive functioning, language skills and memory functioning. His affidavit states that "[i]t is my opinion, to a reasonable degree of psychological certainty, that Mr. Wiley's level of general intellectual functioning is significantly subaverage and falls within the mentally retarded range of intelligence." He also determined that "Wiley exhibits deficits in adaptive behavior in at least three areas expressly recognized in the clinical criteria set forth in the Atkins decision: communications, functional academics, and health and safety" as well as in the area of money concepts. Finally, Dr. Grant's acknowledged in his affidavit that the third element for mental retardation under the clinical definitions is manifestation by age 18. However, he only reviewed Wiley's school records to reach his determination that Wiley demonstrated "an early manifestation of mental retardation." Notwithstanding the absence of any IQ testing during Wiley's school years, Dr. Grant concluded that Wiley's "consistently poor performance" and "extremely poor grades at such a basic level of education strongly indicate severe deficits in intellectual functioning consistent with mental retardation." However, neither Dr. Grant nor Dr. Fox ever affirmatively stated, much less proved, that Wiley's mental retardation had manifested by age 18. Further, neither administered the "MMPI-II and/or other similar tests" to determine that Wiley was not malingering during the testing procedures.

13

¶32. Because the affidavits presented by Drs. Grant and Fox do not fully comply with the requirements of *Chase,* I would deny Wiley's application. However, should Wiley timely refile his application in conformity with *Chase,* it should be considered by this Court.

¶33. I therefore respectfully concur in part and dissent in part.

**DICKINSON, J., JOINS THIS OPINION.**