# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-DR-00051-SCT

*WILLIAM RAY HUGHES*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/20/1996 |
| TRIAL JUDGE: | HON. GEORGE C. CARLSON, JR. |
| COURT FROM WHICH APPEALED: | TATE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF CAPITAL POST-CONVICTION COUNSEL |
| | BY:  C. JACKSON WILLIAMS |
| | TERRY L. MARROQUIN |
| | DAVID P. VOISIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | ROBERT L. WILLIAMS |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | APPLICATION FOR LEAVE TO FILE PETITION FOR POST-CONVICTION RELIEF DENIED - 11/10/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Dianne Galloway awakened her 16-year-old daughter, Ashley, for school at 6:00 a.m. on January 9, 1996.   After experiencing difficulty in starting her car, Ashley departed for Senatobia High School in Tate County.   The car stalled in route and was later seen on Highway

4 in Senatobia at 6:30 a.m. Nearby residents saw her asking for assistance at 7:00 a.m. Ashley was last seen getting into a black pick-up truck at 7:30 a.m. She was not reported missing until her mother returned home at 11:45 p.m. that night.

¶2. On January 22, children scavenging for wood found Ashley's body underneath the floor boards of an abandoned house in Tate County. A pathologist determined that she had been raped, stabbed and strangled. On March 27, a knife and Ashley's class ring were found on property close to the home of Willie Ray Hughes. Hughes, a known sex offender, was questioned by police and DNA samples were obtained from him. The samples taken from Hughes bore the same characteristics as the semen samples taken from Ashley's body. Police also learned that Hughes had driven his mother's black pick-up truck and had failed to report for work at his job in Senatobia on the day of Ashley's disappearance. Hughes' mother told police that Hughes had come home that night with blood on his uniform. A witness later informed authorities that she recognized Ashley's picture in the newspaper as the same person she had seen on January 9 with Hughes in a pick-up truck at 1 p.m. on a rural road in Quitman County.

¶3. Hughes was indicted in Tate County for kidnaping, rape and murder. He was convicted and sentenced to death on November 20, 1996. We affirmed the conviction and sentence in *Hughes v. State*, 735 So. 2d 238 (Miss. 1999), *cert. denied*, 528 U.S. 1083, 120 S. Ct. 807, 145 L. Ed. 2d 680 (2000). Hughes has now filed his application for leave to seek post-conviction relief in the Tate County Circuit Court.

**DISCUSSION**

2

## I. INEFFECTIVE ASSISTANCE OF COUNSEL.

¶4. "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A claimant must demonstrate that counsel's performance was deficient and that the deficiency prejudiced the defense of the case. *Id*. at 687. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Stringer v. State*, 454 So. 2d 468, 477 (Miss. 1984) (citing *Strickland*, 466 U.S. at 687). The focus of the inquiry is on whether counsel's assistance was reasonable considering all the circumstances. *Id*. A reviewing court must strongly presume that counsel's conduct falls within a wide range of reasonable professional assistance. Further, one who claims ineffective assistance must overcome another presumption that the challenged act or omission "might be considered sound trial strategy." *Id*. at 477. In other words, defense counsel is presumed competent. *Bell v. State*, 879 So. 2d 423, 431 (Miss. 2004).

¶5. As for the second prong of prejudice to the defense, a reviewing court must determine whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mohr v. State*, 584 So. 2d 426, 430 (Miss. 1991). This means a "probability sufficient to undermine the confidence in the outcome." *Id.*

¶6. In a death penalty case, the ultimate inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer -- including an appellate court, to the extent it

independently re-weighs the evidence -- would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. There is, however, no constitutional right to errorless counsel. *Mohr*, 584 So. 2d 426, 430 (Miss. 1991). The right to effective counsel does not entitle a defendant to have an attorney who makes no mistakes at trial but simply affords the right to have competent counsel. If the post-conviction application fails on either of the *Strickland* prongs, the analysis of that issue ends. *Davis v. State*, 743 So. 2d 326, 334 (Miss. 1999) (citing *Foster v. State*, 687 So. 2d 1124, 1130 (Miss. 1996)).

A.    **Cross-Examination of State's Pathologist and Failure to Secure an Independent Expert.**

¶7.    Hughes argues that trial counsel was deficient for failing to cross-examine adequately the State's pathologist and for failing to secure an independent expert to dispute the State's evidence concerning the time of death. We will review denial of expert assistance issues on a case-by-case basis and "will grant relief only where the accused demonstrates that the trial court's abuse of discretion is so egregious as to deny him due process and where his trial was thereby rendered fundamentally unfair." *Weatherspoon v. State*, 732 So. 2d 158, 160 (Miss. 1999).

¶8.    In determining whether a defendant was denied a fair trial because of failure to appoint or allow funds for an expert, we consider whether and to what degree the defendant had access to the State's experts, whether the defendant had the opportunity to cross-examine those experts, and lack of prejudice or incompetence of the State's experts. *Fisher v. City of Eupora*, 587 So. 2d 878, 883 (Miss. 1991). Another factor to consider is to what extent the

4

State's case depends upon the State's expert. *Tubbs v. State*, 402 So. 2d 830, 836 (Miss. 1981).

¶9.     In the present case, the State's case did not rise and fall on the evidence establishing the time of death.    Although the State's case was based entirely on circumstantial evidence, the pathologist's testimony was not paramount.    The State's expert opined that Ashley was killed within 24 hours of her disappearance.    However, the jury also heard considerable evidence which established that Hughes was seen with the victim on the day of her disappearance and that his DNA sample was consistent with that found on the victim.    There was more than sufficient evidence in the record from which a reasonable juror could infer that Hughes had killed Ashley.

¶10.    Defense counsel was not professionally negligent in failing to seek an independent expert in pathology.    Even if we were to assume professional error by trial counsel, it does not follow that the presence of a defense expert would have changed the outcome of the trial.

¶11.    Furthermore, Hughes' trial counsel conducted an adequate cross-examination of the State's expert witness on his estimation of the time of the victim's death so to allow the possibility that the victim could have died much as 72 hours after her disappearance.    This issue is without merit.

### B.     Challenge to Venue.

¶12.    Hughes contends that venue, and thus jurisdiction, was never properly established in Tate County.    This issue was raised at trial and thoroughly discussed on direct appeal, and we affirmed the State's selection of venue.    *Hughes*, 735 So. 2d at 249.    Consequently the claim is procedurally barred from further consideration on collateral review.    Miss. Code Ann. § 99-

39-21(3) (Rev. 2000). Since venue was proper in Tate County, it cannot be said that trial counsel's overall performance was somehow professionally deficient in failing to challenge successfully the State's choice of venue. This issue is without merit.

### C. Insufficient Challenge to Admissibility of State's DNA evidence.

¶13. Hughes continues to argue that the State's DNA evidence was scientifically unreliable. The report concluded that the likelihood of someone other than Hughes being the donor of the sample recovered from the victim was 1:86,000. This issue was thoroughly litigated at both trial and on direct appeal. Pursuant to the test set forth in *Polk v. State*, 612 So. 2d 381, 390 (Miss. 1992),[1] a reviewing court should ask whether (1) there is a theory generally accepted in the scientific community which supports the conclusion that DNA testing can produce reliable results, (2) there are techniques capable of producing reliable results in DNA identification, and (3) in the case before the court, whether the testing laboratory performed generally accepted scientific techniques without error in the performance or interpretation of the tests.

¶14. After carefully applying and discussing the *Polk* test, we held that the DNA test performed by GenTest Laboratory and the accompanying report were properly admitted. *Hughes*, 735 So. 2d at 272. The underlying issue is procedurally barred pursuant to Miss. Code Ann. § 99-39-21(3) (Rev. 2000), and Hughes may not recast the issue under the guise of ineffective assistance of counsel. *Wiley v. State*, 842 So. 2d 1280, 1283 (Miss. 2003).

---

[1]Even though M.R.E. 702 has been amended (on May 29, 2003) to require that courts apply the *Daubert* test when evaluating expert testimony, the trial judge applied the correct law as stated in *Polk v. State* at the time of the trial, which was held on November 19, 1996.

### D. Failure to Call Alibi Witnesses.

¶15. During opening statements, defense counsel stated that Ashley had been seen in Memphis by several witnesses, including a man named Percy Pounders. Trial counsel issued a subpoena for Pounders' attendance but he failed to appear. The FBI report wherein Pounders identified Ashley's picture from a photo array indicates that the witness could not recall whether he saw Ashley on January 8 or January 9. Unless Pounders was to testify that he saw Ashley the day after the kidnaping and with someone other than Hughes, then his testimony is not nearly as crucial to establish an alibi defense. Further, trial counsel did call Sue Greenwood to testify that she saw Ashley in her store two days after her disappearance. The jury was apparently not convinced by her testimony and it cannot be said that Pounders' testimony would have changed the outcome at trial. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. It is fair to say that in the present case, trial counsel did their best under the circumstances. This issue is without merit.

### E. Allowing Hughes to Testify in His Own Behalf.

¶16. Hughes submits the affidavit of a psychologist who opines that Hughes should not have been allowed to testify because of his diminished mental capacity. The decision to call a witness is generally considered a matter of trial strategy. *Marler v. Blackburn*, 777 F.2d 1007, 1010 (5th Cir. 1985). It should also be remembered that Hughes had a constitutional right to testify in his own behalf. *Culberson v. State*, 412 So. 2d 1184 (Miss. 1982). Prior to trial, Hughes was evaluated at the direction of the circuit court, and it was determined that

despite his low verbal score, Hughes had a full scale IQ of 81. Hughes is not mentally retarded, and the decision to have him testify must be regarded as strategic. This issue is without merit.

### F. Failure to Object to Admission of Prior Felony Conviction.

¶17. Hughes was previously convicted in Arkansas of raping a seven year-old child. Hughes was nineteen at the time of that offense. Hughes argues that this prior conviction was improperly introduced as an aggravating circumstance and that trial counsel was deficient in failing to object. Miss. Code Ann. § 99-19-101(5)(b) (Rev. 2000) specifically provides that a prior conviction of a capital offense or felony involving the use and/or threat of violence shall constitute an aggravating circumstance for consideration by the jury in imposing the death penalty.

¶18. The crux of Hughes' argument is that the prior conviction was not a crime of violence. Hughes was convicted of raping a minor under the age of 14 pursuant to former Ark. Stat. Ann. § 41-1803 which was replaced in 1993 by Ark. Code Ann. § 5-14-03. The Arkansas habitual offender statute deems convictions under § 5-14-03 to be crimes of violence. Ark. Code Ann. § 5-4-501(C)(a)(v) (Supp. 2001). A prior conviction from another state must be analyzed under Mississippi law to determine whether it is one of violence. *Holland v. State*, 587 So. 2d 848, 874 (Miss. 1991).

¶19. Although there may be instances of consensual, nonviolent sex which nonetheless violate the statutory rape laws, such is not the case here. Hughes was nineteen, and his victim was seven years old. Consent was not an issue, and Hughes' prior crime must be viewed as one of violence sufficient to be used as an aggravating circumstance pursuant to Miss. Code Ann.

8

§ 99-19-101(5)(b) (Rev. 2000). This issue is completely without merit, and it follows that the claim of ineffective assistance of counsel is likewise without merit. The "[f]ailure to raise meritless objections is not ineffective lawyering." *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994).

### G. Failure to Object to Jury Instruction on Habitual Offender Status.

¶20. Hughes argues that the circuit court erred in finding that he was a habitual offender in instructing the jury that he would be sentenced to life without parole if the death penalty was not imposed. First, Hughes was a habitual offender. The circuit court conducted a hearing on November 20, 1996, at which the State introduced certified copies of his prior felony convictions for rape and child fondling. It has already been determined that the rape conviction in Arkansas constituted a crime of violence.

¶21. Second, a jury should be instructed that a defendant's habitual offender status makes him ineligible for parole as this information provides the jury with "all possible relevant information about the individual defendant whose fate it must determine." *Turner v. State*, 573 So. 2d 657, 674 (Miss. 1990); *see also* *Berry v. State*, 575 So. 2d 1 (Miss. 1990) (jury should have been informed that defendant was a habitual offender who was ineligible for probation or parole before deciding whether to sentence him to life imprisonment or death). This issue is without merit. It follows that the claim of ineffective assistance of counsel for failure to object to the jury instruction is likewise without merit.

### H. Failure to Submit Sufficient Mitigating Evidence.

¶22. Hughes argues that trial counsel could have introduced more testimony in mitigation at the sentencing phase of the trial. Hughes presents the affidavits of family members who

9

assert that they could have testified as to the conditions and circumstances surrounding Hughes' childhood. Trial counsel presented a case in mitigation that included the defendant, William Ray Hughes; his older bother, Edward Hughes; and, his younger bother, Walter Hughes. There is nothing in the affidavits which Hughes now presents that seems at all likely to have changed the outcome at sentencing had it been presented to the jury in the form of live testimony.

¶23. Hughes also contends that trial counsel should have developed more evidence to show that he (Hughes) was mentally retarded. As previously discussed, Hughes was evaluated at the State Hospital prior to trial and found to possess a full scale IQ of 81. Hughes is not mentally retarded. Trial counsel did what he could at the sentencing phase and asked the jury to be merciful. Hughes did not receive ineffective assistance of counsel. This issue is without merit.

### I. Failure to Object to Prosecutorial Conduct.

¶24. Hughes asserts that the prosecution incorrectly told the jury that they (the jurors) could not exercise sympathy in their deliberations and that the prosecution improperly argued that he (Hughes) would get to ask for mercy whereas the victim's family would not. Hughes also contends that the prosecutor improperly argued to the jury that he (Hughes) had failed to accept responsibility for his actions. Hughes follows these assertions with the claim that trial counsel failed to object during closing argument when these statements were made.

¶25. The record shows that Hughes has taken the prosecutor's remarks out of context. The transcript reveals clearly that the jury was not inhibited from considering mitigating evidence. Rather, the jury was simply encouraged to render rationally and calmly a lawful decision free

10

of sympathy, bias and prejudice for either side. This language has previously been approved for use in jury instructions. *Evans v. State*, 725 So. 2d 613, 690-91 (Miss. 1997).

¶26.   With regard to the statement concerning the inability of the victim's family to plead for her life, a prosecutor is allowed considerable latitude in his closing argument, *Conner v. State*, 632 So. 2d 1239, 1276-77 (Miss. 1993), including those occasions where a prosecutor makes inferences and deductions as to whether the victim begged for her life. *Davis v. State*, 684 So. 2d 643, 655-56 (Miss. 1996).   The federal constitution does not prohibit the introduction of evidence concerning the background and character of the victim or the impact of the crime on the victim's family. *Hansen v. State*, 592 So. 2d 114, 147 (Miss. 1991).

¶27.   Hughes further contends that he was prejudiced when the prosecutor stated that he (Hughes) had failed to take responsibility for his actions.   Hughes argues that this was an impermissible comment on his decision to go to trial rather than plead guilty although the record hardly allows such a conclusion.   "Total and complete failure on his part to accept responsibility.   You know, that's the first step before someone is entitled to mercy, at least in my view."   Hughes had already been found guilty by the jury yet he still maintained his innocence during the sentencing phase.   This is clearly a personal observation by the prosecutor made during closing argument and not an impermissible comment concerning Hughes' decision to exercise his constitutional right to trial.   This issue is without merit, and trial counsel committed no professional error in failing to object during closing argument.

   **J.**   **Failure to Challenge the State's DNA Evidence.**

¶28.   Hughes filed a supplemental brief in which he again argued that trial counsel's performance was deficient for failure to adequately challenge the State's DNA evidence.

11

Hughes contends that he was not provided discovery material necessary to contest the State's case. As previously discussed, the matter was argued at trial and on direct appeal. Despite Hughes' attempt to recast the issue as one of ineffective assistance counsel, it is still procedurally barred from collateral review pursuant to Miss. Code Ann. § 99-39-21(3) (Rev. 2002).

### K. Cumulative Error.

¶29. Where there is no error in any one of the alleged assignment of errors, there can be no error cumulatively. *Davis v. State*, 660 So. 2d 1228, 1261 (Miss. 1995); *Wilburn v. State*, 608 So. 2d 702, 705 (Miss. 1992) (where there is no reversible error in any part, there is no reversible error to the whole). Thus, even on the merits, this issue fails to make a prima facie showing of ineffective assistance of counsel. *See Foster v. State*, 687 So. 2d 1124, 1141 (Miss. 1996).

## II. SEARCH AND SEIZURE.

¶30. Hughes argues that no consent was given either for the search of his home or for the acquisition of DNA samples. This issue was raised and rejected at both trial and on direct appeal. The record clearly shows that Hughes signed a written consent and waiver of rights prior to the search. On appeal, we found that it was within the trial judge's sound discretion to find that Hughes' consent was voluntary. *Hughes*, 735 So. 2d at 262. The matter is therefore procedurally barred from further consideration on collateral review. Miss. Code Ann. § 99-39-21(3) (Rev. 2002).

## III. ACTUAL INNOCENCE.

¶31.   Hughes asserts that, if he is allowed to conduct further discovery, there will be evidence and testimony to prove his innocence.  Miss. Code Ann. § 99-39-7(5) (Rev. 2002) requires a petitioner for post-conviction relief to make a substantial showing of the denial of a state or federal right.  This bald assertion of innocence fails to make such a showing.  The issue is without merit.

## IV.  MENTAL RETARDATION.

¶32.   In *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002), the United States Supreme Court held that the execution of mentally retarded inmates amounted to cruel and unusual punishment and was therefore prohibited by the Eighth Amendment.   The Court also noted,  "Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id.* at 317.  The *Atkins* majority cited two similar definitions of "mental retardation." The first was that of the American Association on Mental Retardation (AAMR):

> Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, community use, self-direction, health and safety, functional academics, leisure, and work, Mental retardation manifests before age 18.

*Id.* at 308 n.3, citing Mental Retardation: Definition, Classification, and Systems of Support 5 (9th ed.1992).   The second definition comes from the American Psychiatric Association:

> "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years

13

(Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system.

*Id.* citing " Diagnostic and Statistical Manual of Mental Disorders 39 (4th ed.2000).

¶33.    Prior to trial, the circuit court ordered that Hughes undergo a forensic mental evaluation to determine whether or not Hughes had "sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding in the preparation of his defense" and whether, at the time of the offense, Hughes "had the ability to know and understand the nature and quality of his acts."   In the fall of 1996, Hughes was transported to the Mississippi State Hospital at Whitfield where he was examined by clinical psychologist, W. Criss Lott, Ph. D.   A social worker also obtained background information from three of Hughes' relatives:   Carolyn Sue Ingle, his older sister; Mr. Massey, an uncle by marriage; and, Mrs. Massey, his paternal aunt.   Additional information reviewed in preparing the evaluation included the records of the Mental Health Services division of the Arkansas Department of Human Services.   Dr. Lott considered Hughes' past psychiatric history which included a 1980 evaluation by Dr. A.F. Rosendale, M.D., who opined, "It is the opinion of the examining psychiatrist that William R. Hughes is not mentally ill to the degree of legal irresponsibility at the time of this examination and probably was not at the time of the commission of the alleged offense."  Hughes was 20 years old at the time of this evaluation.

¶34.    Dr. Lott also reviewed correspondence dated March 26, 1981, from the Central Arkansas Mental Health Services concerning a two-month psychological evaluation of Hughes. Social worker Sharon K. Chudy reported, "The psychological evaluation revealed William is functioning within the borderline range of intelligence and appears to be socially retarded."

14

In addition to Dr. Lott's own examination of Hughes, the State Hospital performed the following psychological tests: the Wechsler Adult Intelligence Scale-Revised; the Wide Range Achievement Test; the Mini-Mental State Examination; the Minnesota Multiphasic Personality Inventory-2; the Million Clinical Multiaxial Inventory-II; the M Test; the Substance Abuse Subtle Screening Inventory; and, those items assessing antisocial traits on the Structured Clinical Interview of the DSM-III-R. The test revealed that Hughes possessed a verbal IQ of 72, a performance IQ of 94, and full scale IQ of 81. Hughes was 36 years old at the time of this evaluation.

¶35. The tests also revealed that Hughes was not malingering but that he "grossly exaggerated" symptoms of psycho-pathology. Based on the review of all pertinent background information available as well as the results of the psychological testing, Dr. Lott's forensic opinion concluded that "to a reasonable degree of psychological certainty, that Mr. Hughes was not suffering from a severe mental illness at the time of the alleged offenses."

¶36. In order to obtain an evidentiary hearing before the trial court, this Court requires the petitioner to first present an affidavit from at least one qualified expert, who opines to a reasonable degree of certainty that: (1) the defendant has a combined Intelligence Quotient ("IQ") of 75 or below, and; (2) in the opinion of the expert, there is a reasonable basis to believe that, upon further testing, the defendant will be found to be mentally retarded. *Chase v. State*, 873 So.2d 1013, 1029 (Miss. 2004). This Court has noted that, consistent with *Atkins*, mental retardation is not determined by IQ alone. *Foster v. State*, 848 So.2d 172, 175 (Miss. 2003). Further, "common sense dictates an individual's motivation at the time of testing

15

is a factor to be considered when assessing test results. *State v. Dunn*, 831 So.2d 862, 887 n.9 (La. 2002).

¶37. In the present case, Hughes presents the affidavit of Daniel H. Grant, Ed. D. Grant is a licensed psychologist in the State of Georgia. His career reflects experience as a school psychologist and as a counselor in drug-rehabilitation programs. Grant states that he tested Hughes in May 2001 and found him to possess a verbal IQ of 65, a performance IQ of 69, and a full scale IQ of 64. Hughes was 41 years old at the time of this evaluation. Grant concluded that all of Hughes' scores fell within the "mildly deficient" range and opines that Hughes is "mildly mentally retarded." Grant also asserts that Hughes lacks normal adaptive skills and that his condition set in prior to the age of 18 based on Hughes' failing grades in high school.

¶38. Grant submitted a similar affidavit for William L. Wiley. Like Hughes, Wiley had also been previously evaluated and had scored higher on IQ tests which resulted in the conclusion that he (Wiley) was only borderline mentally retarded. This Court found Grant's affidavit in that case insufficient to warrant an evidentiary hearing because: (a) the affidavit relied exclusively on school records for the proposition Wiley's mental condition predated his 18th birthday, and (b) the record indicated that Wiley possessed significant adaptive skills, i.e., sustained employment, military service, and school attendance without special education classes. *Wiley v. State*, 2004 WL 1902428 (Miss. 2004). The State noted that Grant's curriculum vitae included certification from the American Board of Forensic Examiners, an organization that was sharply criticized as a certification mill in an article entitled "Expertise to Go" written by Mark Hansen which appeared in the American Bar Association's eJournal in February 2000.

16

¶39. In the present case, the record shows that Hughes consistently received failing grades in high school before he dropped out. The record does not indicate that he was in special education classes. Further the record indicates that Hughes was a conscientious and reliable employee. This was even noted by the trial judge during a suppression hearing. The State points out that an affidavit from his employer indicates that Hughes was a model employee. Interestingly, Grant says that Hughes' ability to perform unskilled labor without supervision is further proof of his retardation as is his ability to adapt to prison life. Overall, Hughes' adaptive skills seem rather similar to those of Wiley and there is no record of mental assessment of Hughes during his juvenile years.

¶40. Hughes has technically complied with the requirements for an evidentiary hearing under *Chase*. Notwithstanding the technical compliance, the evidence of record in this case overwhelmingly belies the assertions that Hughes is mentally retarded.

¶41. A reviewing court must be able to review all evidence of record in determining whether an evidentiary hearing is necessary. As we similarly held in *Wiley v. State*:

> As stated previously, mental retardation is defined as significantly sub-average general intellectual functioning accompanied by significant limitations in adaptive functioning in two skill areas, the onset of which occurred before age 18. At best, Wiley and his experts allege borderline mental retardation. Wiley also asserts significant limitations in adaptive functioning. However, the affidavits, testimony and statements of Wiley and his friends and family, overwhelmingly dispute such an assertion. Wiley asserts that the onset of his mental retardation occurred before age 18. However, Wiley was first tested in 1987 when he was almost 33 years old. Wiley argues that his school records establish manifestation before age 18. We find that Wiley's school records are not sufficient to establish mental retardation. *Further, we find that the overwhelming weight of the evidence resolves the issue of borderline intelligence and shows that*

17

*Wiley was not mentally retarded before age 18. The record shows that Wiley was a normal, productive citizen, who was never characterized as "mentally retarded" until such time as being mentally retarded became critically important in the realm of post-conviction relief.*

***Wiley v. State***, 2004 WL 1902428, at *6 (emphasis added).

## V.   APPEARANCE BEFORE THE JURY IN SHACKLES.

¶42.   Hughes' second supplemental issue alleges that he was denied due process because he was seen at some point by jurors while still shackled.   The State correctly notes that the presence of a defendant in restraints does not by itself warrant a mistrial or reversal. ***Alexander v. State***, 759 So. 2d 411, 418 (Miss. 2000).   A brief and inadvertent exposure to jurors of defendants in handcuffs is not so inherently prejudicial as to require a mistrial, and defendants bear the burden of affirmatively demonstrating prejudice.   ***United States v. Diecidue***, 603 F.2d 535, 549 (5th Cir. 1979).   Further, the issue was capable of determination both at trial and on direct appeal such that it is now procedurally barred from consideration. Miss. Code Ann. § 99-39-21(1) (Rev. 2002).

## VI.   JUROR DISHONESTY

¶43.   Hughes presents the affidavit of a third party who claims that one of the jurors heard another juror say that she had been raped as a child.   The juror interviewed by the third party affiant was unsure of the other juror's identity.   Miss. Code Ann. § 99-39-27(5) (Rev. 2002) provides as follows:

> Unless it appears from the face of the application, motion, exhibits and the prior record that the claims presented by such are not procedurally barred under Section 99-39-21 and that they further present a substantial showing of the denial of a state or

18

federal right, the court shall by appropriate order deny the application.

The affidavit submitted by Hughes constitutes double hearsay and otherwise fails to make the required substantial showing of the denial of any right guaranteed by the state or federal constitutions. This issue is without merit.

## CONCLUSION

¶44. For these reasons, we deny the application of William Ray Hughes for leave to seek post-conviction collateral relief in the circuit court.

¶45. **APPLICATION FOR LEAVE TO FILE PETITION FOR POST-CONVICTION RELIEF, DENIED.**

**SMITH, C.J., AND EASLEY, J., CONCUR. DICKINSON, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY COBB, P.J. DIAZ, CARLSON, GRAVES AND RANDOLPH, JJ., NOT PARTICIPATING.**

**DICKINSON, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶46. William Ray Hughes has been found guilty of rape and murder, and he has presented nothing which persuades me that the conviction should be vacated. With respect to the conviction, the majority's analysis of each issue raised by Hughes is, I believe, correct.

¶47. This case is before us today because, three years after Hughes's appeal was denied, the United States Supreme Court, in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed. 2d 535 (2002), made a significant change in the law which directly affects whether Hughes may be sentenced to death. Prior to the *Atkins* decision in 2002, it was lawful and constitutionally acceptable to execute mentally retarded criminals. However, the *Atkins*

19

majority decided that such executions were unconstitutional, even for criminals who had already been convicted, but not yet executed. This created an extremely difficult task for the appellate courts throughout the Country, particularly since we were provided virtually no guidance from the *Atkins* Court in determining the procedure and guidelines for the determination of mental retardation with its resulting exemption from the death penalty.

¶48. The difficulty created by *Atkins* for cases where criminal defendants with credible claims of mental retardation were sentenced to death prior to *Atkins*, should be obvious. These defendants, and their counsel, were unaware that mental retardation would, in the future, prevent their execution. Thus, prior to *Atkins*, the trial courts did not conduct hearings to determine whether defendants were mentally retarded and therefore exempt from execution. Instead, trial courts held hearings on the very different question of whether a defendant was incapable of assisting in his or her defense. Also, prior to *Atkins*, juries made the determination of whether a defendant was criminally insane; that is, not guilty by reason of insanity. Neither of these pre-*Atkins* determinations answered the question of whether a defendant was mentally retarded. Thus, for defendants whose trials were completed prior to *Atkins*, we found ourselves needing the answer to a question which had never been presented to the trial court or jury. Is this defendant mentally retarded and, thus, exempt from the death penalty?

¶49. In the case before us today, no court has ever made a determination of whether Hughes is mentally retarded. The question has not even been asked before. Thus, we must either order a hearing for the factual determination of whether Hughes is mentally retarded, or decide the

factual question ourselves. The majority erroneously chooses to become a finder of fact and decide the question here.

¶50. It is my belief however that, except in unusual and limited circumstances (none of which are present here), this Court does not sit as a finder of fact, but as an appellate court of limited jurisdiction. Miss. Const. art. 6, §146. *See also **Brown v. Sutton***, 158 Miss. 78, 121 So. 835 (1929). Thus, I believe the trial court, not this Court, should conduct the hearing. I therefore respectfully dissent, only to so much of the majority opinion as prevents a hearing on the question of mental retardation. If Hughes is mentally retarded, the United States Supreme Court has held that he may not be sentenced to death. If he is not found to be mentally retarded, his execution will not violate *Atkins*.

¶51. I should note at the outset my disagreement with the majority's opinion in *Atkins*, and my agreement with the dissents penned by Chief Justice Rehnquist and Justice Scalia, which provide that mental retardation is no indication that a person is incapable of discerning right from wrong – certainly not in the "not guilty by reason of insanity" sense -- and incapable of expressing emotion and remorse when providing testimony in mitigation of the death penalty. To me, it is somewhat demeaning to mentally retarded persons, in general, to assume that they are incapable of feeling and expressing emotion and remorse, and that they don't make good witnesses.[2] I find most mentally retarded persons to be quite capable of expressing emotion, feelings, affection and ideas.

---

[2]These are among the reasons given by the United States Supreme Court majority for their decision to exempt mentally retarded persons from the death penalty.

¶52. That said, I must recognize that the majority in *Atkins* has held that we may not execute mentally retarded persons, regardless of the facts and circumstances of their crime. And so long as *Atkins* remains controlling law from the United States Supreme Court, we must follow it.

¶53. It should be made clear that I do not claim Hughes is mentally retarded; nor am I expressing an opinion that he should not be executed. I simply recognize and believe that we are constitutionally required to order the circuit court to hold a hearing and make the determination.

¶54. The majority does not (nor could it) conclude that Hughes has not complied with all requirements set forth by this Court in *Chase v. State*, 873 So. 2d 1013 (Miss. 2004), for a hearing on the question of mental retardation. Were we to follow *Atkins* and our holding in *Chase*, Hughes would have a hearing. The majority fails to explain why it refuses to follow *Chase*, except to say that the "record in this case belies the assertions that Hughes is mentally retarded." In other words, the majority has made the factual determination, from the record, that Hughes is not mentally retarded.[3] I will now proceed to examine that same record which, in my view, hardly "belies the assertions that Hughes is mentally retarded."

¶55. It bears repeating that I am not looking to determine whether Hughes is mentally retarded; rather, I am only looking to see if a sufficient factual question has been raised which would justify a hearing.

**Professional Opinions.**

---

[3]This factual conclusion that Hughes is not mentally retarded has been reached by the majority without benefit of a single professional opinion to that effect.

22

¶56. The record reflects four professional opinions. One expresses a clear, unambiguous opinion that Hughes is mentally retarded. One says he is "socially retarded," but expresses no opinion concerning mental retardation. The other two express no opinion on the question of mental retardation.

¶57. W. Criss Lott, Ph. D., found, "to a reasonable degree of psychological certainty, that Mr. Hughes was not suffering from a severe mental illness at the time of the alleged offenses." While this may be true, Dr. Lott never provides any opinion as to whether Hughes is mentally retarded. He found only that Hughes was not suffering from a severe mental illness. "Severe mental illness" is certainly not synonymous with "mentally retarded."

¶58. A.F. Rosendale, M.D., opined, "It is the opinion of the examining psychiatrist that William R. Hughes is not mentally ill to the degree of legal irresponsibility at the time of this examination and probably was not at the time of the commission of the alleged offense." Again, "mentally ill" does not mean "mentally retarded." Dr. Rosendale expressed no opinion concerning mental retardation.

¶59. Sharon K. Chudy, social worker, evaluated Hughes and reported, "The psychological evaluation revealed William is functioning within the borderline range of intelligence and appears to be socially retarded." It is unknown whether Chudy's definition of "socially retarded" includes "mental retardation." Chudy expressed no opinion as to whether Hughes is mentally retarded.

¶60. Daniel H. Grant, Ed. D., evaluated Hughes and reported that, in his opinion to a reasonable degree of psychological certainty, Hughes is mildly mentally retarded.

23

¶61.    Thus, the only professional opinion before this Court on the question of whether Hughes is mentally retarded comes from Dr. Grant, who states, to a reasonable degree of psychological certainty, that he is.

¶62.    The majority appears to question Dr. Grant's credibility by pointing out that one of his certifications comes from an organization criticized as a "certification mill."   The authority cited for this claim is an article in a magazine.[4]   We are not provided the name of the author. While I do not believe it is appropriate for this Court to engage in evaluation of Dr. Grant's credentials,[5] they should now be fully set forth in response to the majority's implication that he is not credible.

1.    Dr. Grant is licensed as a psychologist by the State of Georgia, and is board certified as a neuropsychologist by the American Board of Professional Neuropsychology.   He is also a board certified forensic examiner and a Fellow of the American College of Forensic Examiners.

2.    Dr. Grant worked for almost fifteen years as a contract a consultant for the Diagnostic Unit of the Coastal Correctional Institution in Georgia, where he assessed approximately 2,500 inmates, the majority of which had IQ's below 80.   He made recommendations regarding their adaptive skills.

3.    Dr. Grant worked for five years as a school psychologist, where he assessed students for special education classes.

4.    Dr. Grant worked over three years on contract with the Georgia Department of Juvenile Justice as a consultant, providing assessments of adaptability and treatment.

---

[4]Magazine articles are seldom accepted by this Court as authority.

[5]So long as Dr. Grant qualifies as an expert under the requirements of *Chase* and M.R.E. Rule 702 (which he does), we should not inquire further, but leave the credibility question to the sound discretion of the trial court.

24

5. In addition to his graduate and post-graduate studies in psychology and neuro-psychology, Dr. Grant minored at the doctoral level in the sub-speciallties of reading and mental retardation.

¶63. In reaching his opinion in this case, Dr. Grant reviewed all pertinent opinions, records and test results from other professionals, including hearing and trial testimony. He further reviewed Hughes's school records and institutional records from the Mississippi State Penitentiary at Parchman and the Arkansas State Hospital, including treatment notes.

¶64. In addition, Dr. Grant tested Hughes over a two-day period. He spent approximately eleven hours with Hughes, completing his evaluation. He spent an additional ninety minutes reviewing Hughes's Parchman prison records.

¶65. Dr. Grant is certainly, in my opinion, qualified to render opinions in this case. Whether his opinions are persuasive should be left to the trial court at a hearing.

**School Performance and Academic Skills.**

¶66. The majority recognizes that "the record shows that Hughes consistently received failing grades in high school before he dropped out." To amplify Hughes's poor school record a bit, I think it only fair to point out that when Hughes was thirteen years old when in the fifth grade with students who were ten years old, and he was seventeen when he was in the eighth grade with students who were thirteen years old.

¶67. Also, I think it only fair to supplement the majority's statement, "The record does not indicate that he was in special education classes." That he was not actually in special education classes means little, considering that the record reflects he would have qualified for special education classes, but his father refused to allow it.

25

¶68.    We are provided with Hughes's scores from the Kaufman Functional Academic Skills Test. He achieved "a standard score 58 (comparable to an IQ score) and a percentile rank of less than 1 (in other words, more than 99 percent of the people taking this test within his age range scored better than him). He also scored a 58 functional reading skills standard (less than one percentile). His reading recognition score on the WRAT-3 (Wide Range Achievement Test - revision three, was 49 "with a corresponding grade score of 2.1, and a spelling standard score of 51 with a corresponding grtade score of 2.1" These scores are expected of second-graders.

**IQ Testing.**

¶69.    Dr. Grant administered an extensive battery of tests to determine whether Hughes met the threshold for mental retardation. Some of the significant excerpts from Dr. Grant's affidavit are, as follows:

> Mr. Hughes' performance on the Wechsler Adult Intelligence Scale - third edition (WAIS-III) yielded a **verbal IQ of 65**, (placing him at the 1 percentile), **performance IQ of 69**, (placing him on the 2 percentile), and a **full-scale IQ of 64**, (placing him at the 1 percentile). His performance also yielded the following index scores: **verbal comprehension index of 65** (lowest 1 percentile); **perceptual organization index of 70** (lowest 2 percentile); **working memory index of 65** (lowest 1 percentile); **perceptual speed index of 8l** (lowest 10 percentile). This means there was not a significant difference between his verbal and performance intelligence scores, which indicates both skills are fairly evenly developed.

> All of Mr. Hughes scores on the WAIS-III fall within the mildly deficient range **(which is the equivalent of mild mental retardation)**, with the exception of his score on the perceptual speed index. The perceptual speed index, however, does not measure reasoning and thinking; it measures perceptual speed and accuracy.

26

William Ray Hughes's performance on the intellectual measures indicated that **98 to 99 percent of the population scored higher than he on the Wechsler Adult Intelligence Scale - third edition**.

Mr. Hughes was also administered the Comprehensive Test of Verbal Intelligence (CTONI) This test is a comprehensive measure of **nonverbal intelligence**. Nonverbal intelligence refers to those abilities that are independent of language and that enhance a person ability to function intelligently. It is essentially a measure of nonverbal reasoning and of nonverbal problem solving. William Ray Hughes had a **pictorial nonverbal IQ score of 55**, a **geometric nonverbal IQ score of 66**, and a **nonverbal IQ score of 57**. His geometric nonverbal IQ score is a percentile rank of 1; the other two scores are less than a 1percentile rank. This means that **99 percent or more of the population performed better between William Ray Hughes** on these tests.

(Emphasis added).

¶70.    Additionally, Dr. Grant found these test results to be consistent with those reported in a psychological interview prepared by Vickie Jenkins, an employee of the Mississippi Department of Corrections. Jenkins reported Hughes had an IQ of 67.

¶71.    Although the test results and opinions provided by Dr. Grant are enough to require a hearing, there is more. Dr. Grant states that "[t]he diagnosis of mental retardation involves three prongs: significantly sub-average intelligence; related limitations in two or more adaptive skills; and the presence of such sub-average intelligence and limitations prior to the 18th birthday." Having evaluated the intelligence prong, Dr. Grant moved to the adaptive skills, and stated: "I believe, to a reasonable degree of professional certainty, that William Ray Hughes is significantly deficient in at least two areas of adaptive functioning." Having stated that Hughes meets the test we require under *Chase*, Dr. Grant explained how he reached his conclusions:

27

Two of the areas of adaptive behavior that I assessed, and in which William Ray Hughes is significantly deficient, are communication skills and functional academics.

William Ray Hughes' performance on the Kaufman Functional Academic Skills Test yielded a **standard score of 58 (comparable to an IQ score**) and a percentile rank of less than 1(in other words, more than 99 percent of the people taking this test within his range scored better than him). He achieved a **functional reading skill standard of 58** and percentile rank of less than one percent. His composite standard score on the **functional skills test was 55** with a percentile rank of less than one percent. His performance on the Wide Range Achievement Test - revision three (WRAT-3) yielded a **reading recognition standard score of 49** with a corresponding grade score of 2.2, and a **spelling standard of 51** with a corresponding grade of 2.1. Stated simply, he has the reading recognition and spelling abilities expected of someone in the second grade. His arithmetic performance yielded a **standard score of 60** with a grade score of 3.6. His performance on all of the tests making up the WRAT-3 fall within the mildly deficient/mentally retarded range.

His communication skills were assessed by administering the Oral and Written Language Scales (OWLS), and the Expressive Vocabulary Test (EVT). Mr. Hughes' performance on the OWLS yielded a listening comprehension standard score of 61, and oral expression **standard score of 60**, and an oral composite **standard score of 58**. Listening comprehension scale items include lexical, syntactic, and supra linguistic skills. Categories of oral expression scale items include lexical, syntactic, and supra linguistic skills. Categories of oral expression scale items included lexical, syntactic, pragmatic and supra linguistic skills. The expressive vocabulary test measures an individual's ability to give a synonym for a provided word. Mr. Hughes' performance on this test yielded a **standard score of less than 40**, indicated a significant deficit in this skill, even for an individual of his level of intelligence.

I administered the Independent Living Scales to Mr. Hughes. His performance on this test indicates significant deficits on the following subtests: managing money; managing home and transportation; health and safety; and social adjustment. William Ray Hughes' full-scale standard score (comparable to IQ score) on the **Independent Living Scales was 66**, which is **very consistent with his full-scale IQ of 64 on the WAIS-III**. Individuals who score within his range are not usually recommended for independent living.

(Emphasis added).

¶72.   Dr. Grant next evaluated Hughes's  academic records to determine whether the mental retardation manifested prior to age eighteen.  He stated:

> Review of Mr. Hughes' academic records revealed repeated social promotions. It reveals that he was 13 years old in the fifth grade and 17 years old when he left in the eighty grade.  It also indicated that he repeated several grades, and that even though he failed a grade he was socially promoted into the next grade.  In interviews with his siblings, the undersigned learned that they believed that he probably should have been in special education classes but their father would never have allowed it.  Review of his educational records and his academic performance is consistent with an individual who is mildly mentally retarded. It is my opinion that he would have qualified for special education classes.  **It is my opinion, to a reasonable degree of professional certainty, that William Ray Hughes experienced such sub-average intelligence and limitations prior to his 18th birthday.**
>
> **It is therefore my clinical opinion, to a reasonable degree of psychological certainty, that Mr. Hughes clearly meets the criteria set forth in the Diagnostic and Statistical Manual - IV, and the 9th edition of the Mental Retardation Handbook of the American Association of Mental Retardation criteria for mild mental retardation.  It is my clinical opinion, to a reasonable degree of psychological certainty, that William Ray Hughes is mildly mentally retarded.**

(Emphasis added).

¶73.   There is evidence in the record that Hughes scored higher when administered some of these same tests by another professional.  This simply presents us with a conflict in the evidence of test results.  As for professional opinions of whether Hughes is mentally retarded, there is only one in this record:  that he is.

¶74.   William Ray Hughes committed a crime which certainly justifies the penalty of death. However, if he is mentally retarded – even slightly – the State does not have the right to execute him under the law, a law we are sworn to uphold, whether we agree with it or not.

¶75. Is Hughes mentally retarded? Reviewing the test results, hospital notes and opinions in this case convinces me that I simply am not qualified to answer the question. But neither is the majority. There is, at a minimum, sufficient evidence of mental retardation to warrant a hearing in the trial court on the matter. Should the trial court determine Hughes is not mentally retarded, his execution will not violate *Atkins*.

¶76. For the reasons stated herein, I respectfully dissent from this Court's denial of a hearing in the trial court on whether Hughes is mentally retarded. I agree, in all other respects, with the majority.

**COBB, P.J., JOINS THIS OPINION.**